# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| BIEJAN ARVON, | * | |
| Plaintiff, | * | |
| v. | * | Civil No.: BPG-17-2022 |
| LIBERTY MUTUAL FIRE INSURANCE CO., | * | |
| Defendant/Third-Party Plaintiff, | * | |
| v. | * | |
| MARC SELDIN ROSEN, ESQ. and THE LAW OFFICES OF MARC SELDIN ROSEN, LLC, | * | |
| Third-Party Defendants. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

Currently pending is defendant/third-party plaintiff Liberty Mutual Fire Insurance Company's ("defendant") Motion for Summary Judgment as to Counts II and III of Plaintiff Arvon's Complaint ("Motion") (ECF No. 99), plaintiff Biejan Arvon's ("plaintiff") Response in Opposition to Defendant/Third-Party Plaintiff Liberty Mutual Fire Insurance Company's Motion for Summary Judgment ("Opposition") (ECF No. 113), and defendant's Reply to Plaintiff Arvon's Opposition to Motion for Summary Judgment ("Reply") (ECF No. 117).[1] The issues are fully briefed, and no hearing is necessary. Loc. R. 105.6. For the reasons stated below, defendant's Motion (ECF No. 99) is GRANTED.

---

[1] Also currently pending is defendant's Motion for Summary Judgment Against Third-Party Defendant Marc Seldin Rosen, Esq. (ECF No. 100) seeking summary judgment on its contribution claim against Mr. Rosen. Given that defendant's Motion (ECF No. 99) will be granted, however, and plaintiff's remaining counts will be dismissed, defendant's contribution claim is no longer valid, and this motion will be denied as moot.

# I.     **BACKGROUND**

On July 8, 2011, plaintiff was driving a vehicle owned by Ethel Mae Campbell ("Ms. Campbell"), a customer of plaintiff's automobile repair shop, with her permission, when he was rear-ended by Alireza Gol ("Mr. Gol"). (ECF No. 99-1 at 7). Mr. Gol was operating a vehicle owned by Hamed Khodaparasti Dehboneh ("Mr. Khodaparasti"), with Mr. Khodaparasti's permission. (Id. at 7). Mr. Khodaparasti was also a passenger in the vehicle at the time of the accident. (ECF No. 113 at 2). Prior to the accident, Mr. Khodaparasti, "a recent immigrant to the United States, with no credit or employment history, obtained the assistance of his friend and roommate Puya Shakiba to purchase the vehicle and obtain insurance for the vehicle through Liberty Mutual Insurance Company." (ECF No. 99-1 at 7). Mr. Khodaparasti and Puya Shakiba ("Mr. Shakiba") purchased the insurance policy through S.M. Mirjifari, a sales representative for defendant, "with whom Mr. Shakiba was acquainted through weekend pickup soccer games." (Id.)

On July 10, 2011, "someone called [defendant's] Claims Call Center and reported the accident on behalf of Messrs. Khodaparasti and Gol, both of whom did not speak English." (ECF No. 99-1 at 8). On July 11, 2011, plaintiff's bodily injury claim was assigned to claims representative Vermeka Lang ("Ms. Lang"), who spoke with Mr. Gol or Mr. Khodaparasti, who informed her about the details of the incident.[2] (Id.; ECF No. 113 at 4). Ms. Lang also spoke with someone at plaintiff's house who advised that plaintiff was in the hospital. (ECF No. 99-1 at 8). That same day, Senior Claims Representative Christine Fletcher ("Ms. Fletcher") completed her bodily injury coverage analysis of the claim. (ECF No. 99-1 at 8). Defendant then accepted coverage for the accident and found that "Mr. Gol was covered under the policy as a permissive

---

[2] While defendant states that this conversation was with Mr. Khodaparasti (ECF No. 99-1 at 8), plaintiff states that notes from the conversation reflect a first-person experience of the driver, and that the conversation was accordingly with Mr. Gol (ECF No. 113 at 4 n.3).

user" and that "Mr. Gol was one hundred percent at fault; and accepted liability for the accident." (Id. at 9). On July 8, 2011, defendant issued payment for the repair of Ms. Campbell's car. (Id.) On July 13, 2011, Ms. Lang spoke to plaintiff, who was still in the hospital, about his accident and his injuries. (Id.) Similarly, on July 20, 2011, defendant issued payment for the repair of Mr. Khodaparasti's car. (Id.) Plaintiff's bodily injury claim remained unresolved, however, and as of December 5, 2011, Ms. Fletcher assumed the handling of this claim.[3] (Id.) Ms. Lang and Ms. Fletcher sent several letters to plaintiff regarding his claim between 2011 and 2013. (Id. at 10). Each of these letters included a subject line that stated "Insured: Puya Shakiba." (Id.)

On August 30, 2013, Ms. Fletcher called plaintiff and spoke to his wife, who advised that plaintiff had retained counsel. (Id.) On September 16, 2013, Marc Seldin Rosen ("Mr. Rosen") "faxed a letter of representation to Ms. Fletcher, advising that he was collecting Mr. Arvon's medical records and would be in a position to discuss resolution soon." (Id. at 11). Ms. Fletcher left messages for Mr. Rosen on October 2 and 22, 2013, to discuss the status of the case. (Id.) Ms. Fletcher also sent a letter to Mr. Rosen requesting an update on November 26, 2013. (Id.) This letter also bore the subject line "Insured: Puya Shakiba." (Id.) Ms. Fletcher left Mr. Rosen another message on January 6, 2014, as did her colleague, Larry Connor, on February 7, 2014. (Id. at 11–12). Ms. Fletcher reached Mr. Rosen by telephone on March 26, 2014, and Mr. Rosen advised that he would be sending a demand package soon. (Id. at 12). On May 9, 2014, Ms. Fletcher sent Mr. Rosen another letter, with the same subject line, asking when she could expect the demand package. (Id.)

On June 2, 2014, Mr. Rosen sent a demand letter, with the subject line "Your Insured: Puya Shakiba." (Id.) In this letter, Mr. Rosen stated "[a]s you know, your insured, Puya Shakiba, rear

---

[3] Defendant does note that it paid plaintiff's outstanding medical bills totaling $11,600, although it does not indicate when it paid those bills. (ECF No. 99-1 at 15).

ended Mr. Arvon on July 8, 2011." (ECF No. 113 at 4–5 (quoting ECF No. 113-9 at 2)). This demand letter was received by defendant by June 5, 2014 and marked as "organized and reviewed by June 12, 2014." (Id. at 16). Ms. Fletcher also viewed the claim file on June 6, 2014. (Id. at 4–5). On June 23, 2014, Mr. Rosen filed suit in the Baltimore County Circuit Court, and emailed Ms. Fletcher on June 27, 2014 to inform her that he had filed suit, but that he did not want to serve it, if doing so was unnecessary. (Id. at 5–6). The complaint in that case named Puya Shakiba as the defendant, and Mr. Rosen's June 27 email included a subject line "Biejan Arvon v. Puya Shakiba . . . ." (ECF No. 99-1 at 12). Ms. Fletcher did not respond to this email, and Mr. Rosen emailed her again on July 2, 2014, to let her know that he had sent out the lawsuit for service of process. (ECF No. 113 at 6). Ms. Fletcher responded that same day, stating "that she 'did receive [the] demand package,' but had not 'had time to complete the evaluation.'" (Id. (quoting ECF No. 113-15 at 2)). On July 15, 2014, Mr. Shakiba contacted defendant's Claim Call Center advising that he had been served with a lawsuit, and Ms. Fletcher sent the suit papers to defendant's Staff Counsel Jonathan Stebenne's office. (ECF No. 99-1 at 13). At some point, "Ms. Fletcher 'noticed that there was an issue with who was named in the lawsuit' and 'told [her] manager about it.'" (ECF No. 113 at 6 (quoting ECF No. 113-8 at 5)). Finally, on July 28, 2014, Mr. Rosen emailed Ms. Fletcher again, advising that he had effected service and asking whether they would be able to resolve the claim. (ECF No. 99-1 at 13).

"On July 29, 2014, Shakiba filed his Answer to the Complaint, denying liability for the accident." Arvon v. Shakiba, No. 2719, 2017 WL 1592555, at *2 (Md. Ct. Spec. App. May 1, 2017). "It was at this time that in-house counsel for Liberty Mutual disclosed to appellant that the actual driver was Gol and the owner was [Khodaparasti]."[4] Id. On August 4, 2014, plaintiff

---

[4] The Court of Special Appeals noted that "it is unclear from the briefs and the record exactly when this information was disclosed." Id. at *2 n.4. Similarly, here, the exact date is unclear from the briefs and record, but the parties do

filed an amended complaint adding Mr. Gol and Mr. Khodaparasti as defendants.  Id.  Thereafter,

the court granted summary judgment in Mr. Gol and Mr. Khodaparasti's favor, as they were not

sued before the statute of limitations expired.  Id.  The court also granted summary judgment in

Mr. Shakiba's favor, finding that Mr. Shakiba had no involvement in the accident.  Id.  The Court

of Special Appeals upheld the trial court's dismissal, finding that "Shakiba's involvement in the

case stems exclusively from the fact that his insurer, Liberty Mutual, mistakenly identified him as

the party at fault."[5]  Id.  The court further concluded that the statute of limitations period was not

tolled under the doctrine of equitable tolling because the plaintiff, through Mr. Rosen, "failed to

exercise the due diligence required for equitable tolling to be applied."  Id. at *3.  Specifically, the

court noted, there was a police report that identified Mr. Gol and Mr. Khodaparasti, but plaintiff

"made no effort to review it and sue the correct parties prior to the expiration of the statute of

limitations."  Id.  The court also noted that plaintiff's "claims regarding misrepresentations and

bad faith may be more properly aimed at Liberty Mutual in another forum."  Id. at *4.  Plaintiff

then filed the present lawsuit against defendant alleging both negligent and intentional

misrepresentation.[6]  (ECF No. 2 at 8–10).  Defendant filed a third-party complaint against

plaintiff's attorney, Marc Seldin Rosen, and his law firm, the Law Offices of Marc Seldin Rosen,

seeking indemnification and contribution for all sums that may be adjudged against defendant, in

favor of plaintiff.  (ECF No. 51).  Defendant's indemnification claim was dismissed by the court,

however, after Mr. Rosen filed a motion to dismiss, as was defendant's claim for contribution

based on plaintiff's intentional misrepresentation claim.  (ECF No. 85).  Defendant's claim for

---

not dispute that this disclosure occurred after July 8, 2014, the date the statute of limitations expired.  (ECF No. 113 at 7).

[5] Defendant argues, however, that this statement was merely "dicta" that was not supported by the record.  (ECF No. 99-1 at 17).

[6] Plaintiff also brought an additional count for violation of Insurance Article § 27-303 (ECF No. 2 at 7), but this count was previously dismissed by the court.  (ECF No. 44).

contribution from Mr. Rosen based on plaintiff's negligent misrepresentation claim remains. (Id.) Defendant now asks the court to grant summary judgment for defendant on both of plaintiff's counts. (ECF No. 99 at 1).

## II. STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute remains "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is properly considered "material" only if it might affect the outcome of the case under the governing law. Id. The party moving for summary judgment has the burden of demonstrating the absence of any genuine issue of material fact. Fed. R. Civ. P. 56(a); Pulliam Inv. Co., Inc. v. Cameo Props., 810 F.2d 1282, 1286 (4th Cir. 1987). On those issues for which the nonmoving party will have the burden of proof, however, it is his or her responsibility to oppose the motion for summary judgment with affidavits or other admissible evidence specified in Federal Rule of Civil Procedure 56. Fed. R. Civ. P. 56(c); Mitchell v. Data Gen. Corp., 12 F.3d 1310, 1315–16 (4th Cir. 1993). If a party fails to make a showing sufficient to establish the existence of an essential element on which that party will bear the burden of proof at trial, summary judgment is proper. Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986).

When reviewing a motion for summary judgment, the court does not evaluate whether the evidence favors the moving or nonmoving party, but considers whether a fair-minded jury could return a verdict for the nonmoving party on the evidence presented. Anderson, 477 U.S. at 252. In undertaking this inquiry, the court views all facts and makes all reasonable inferences in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio

Corp., 475 U.S. 574, 587 (1986). The nonmoving party, however, may not rest on its pleadings, but must show that specific, material facts exist to create a genuine, triable issue. Celotex, 477 U.S. at 324. A "scintilla" of evidence in favor of the nonmoving party, however, is insufficient to prevent an award of summary judgment. Anderson, 477 U.S. at 252. Further, "mere speculation" by the nonmoving party or the "building of one inference upon another" cannot create a genuine issue of material fact. Cox v. Cty. of Prince William, 249 F.3d 295, 299–300 (4th Cir. 2001). Summary judgment should be denied only where a court concludes that a reasonable jury could find in favor of the nonmoving party. Anderson, 477 U.S. at 252.

## III. DISCUSSION

In Count II of his Complaint (ECF No. 2), plaintiff alleges that defendant made "many misrepresentations of fact pertaining to the identity of its insured driver, including its settlement of the property damage claim in the name of someone other than the driver at fault," which plaintiff alleges were "assertions of fact that were false." (ECF No. 2 at ¶ 27). Plaintiff further alleges that these misrepresentations were made "with the intention that [p]laintiff would rely on the same and that "[d]efendant knew that plaintiff would [and did] rely on the false assertions, statements, and actions and that the consequence of such reliance would cause damage to [p]laintiff's legal right to compensatory damages through direct action against the at fault driver for the occurrence referenced herein." (Id. at ¶¶ 28–29). Plaintiff states that, "by justifiably relying on [d]efendant's misrepresentations," he was damaged significantly, as he "lost the ability to win compensation directly from the driver at fault; he was forced to undergo lengthy and protracted litigation to exhaust his civil remedies against the parties perceived to be at fault; he was denied recovery of compensatory damages, and such damages remain due and owing." (Id. at ¶ 31).

Similarly, in Count III of his Complaint, plaintiff alleges that defendant "asserted many false misrepresentations of fact" to plaintiff and that defendant both "knew that its misrepresentations of fact were false" and "made the false misrepresentations for the purpose of defrauding [p]laintiff." (ECF No. 2 at ¶¶ 33–35). Plaintiff further alleges that defendant "anticipated that [p]laintiff would rely on its misunderstanding of events based on [d]efendant's many misrepresentations," that "[p]laintiff did, in fact, reasonably rely on the [d]efendant's misrepresentations to his substantial detriment," and that "[p]laintiff's reliance was justifiable." (Id. at ¶¶ 36–37). Finally, plaintiff alleges, "[a]s a direct and proximate consequence of [d]efendant's fraud, [p]laintiff sustained significant damages for which [d]efendant is responsible." (Id. at ¶ 38).

To prevail on a claim of negligent misrepresentation, a plaintiff must establish, by a preponderance of the evidence, that:

> (1) the defendant, owing a duty of care to the plaintiff, negligently asserts a false statement;

> (2) the defendant intends that his statement will be acted upon by the plaintiff;

> (3) the defendant has knowledge that the plaintiff will probably rely on the statement, which, if erroneous, will cause loss or injury;

> (4) the plaintiff, justifiably, takes action in reliance on the statement; and

> (5) the plaintiff suffers damage proximately caused by the defendant's negligence.

Martens Chevrolet, Inc. v. Seney, 292 Md. 328, 337 (1982).

To prevail on a claim of fraudulent misrepresentation, plaintiff must establish by clear and convincing evidence:

> (1) that defendant made a misrepresentation of a material fact which was false;

> (2) that its falsity was known to him;

> (3) that defendant made the misrepresentation for the purpose of defrauding plaintiff;

(4) that plaintiff not only relied upon the misrepresentation but had the right to do so and would not have done the thing from which the damage resulted if it had not been made; and

(5) that plaintiff suffered damage from defendant's misrepresentation.

Finch v. Hughes Aircraft Co., 57 Md. App. 230, 231–32 (1984) (citing James v. Weisheit, 279 Md. 41, 44 (1977); Fowler v. Benton, 229 Md. 571, 578 (1962)).  Alternatively, a plaintiff may prevail on a claim of fraudulent misrepresentation under a theory of concealment or non-disclosure by showing that:

(1) Defendant owed a duty to plaintiff to disclose a material fact;

(2) Defendant failed to disclose that fact;

(3) Defendant intended to defraud or deceive plaintiff;

(4) Justifiably relying on the concealment, plaintiff takes action; and

(5) Plaintiff suffers damages from defendant's concealment.

Lubore v. RPM Assocs., Inc., 109 Md. App. 312, 329 (1996) (citing Finch, 57 Md. App. at 231–32, Schnader v. Brooks, 150 Md. 52, 57–58 (1926)).

Although each of plaintiff's claim involves distinct elements, I will focus herein on those elements common to each claim.   For the reasons discussed below, I find that both counts fail as a matter of law.   Specifically, I find that there are no genuine disputes of material fact and that defendant is entitled to summary judgment because no reasonable jury could find that: (1) defendant made a false statement to plaintiff; (2) defendant owed a duty to plaintiff to disclose all material facts; and (3) defendant intended to defraud plaintiff or intended that its statements would be acted upon by plaintiff.

A. **False Statement/Failure to Disclose Material Facts**

As noted by defendant, "[t]he only place [plaintiff] contends [defendant] was dishonest is in the letters that [defendant] sent him." (ECF No. 99-1 at 9 (citing ECF No. 99-3 at 11)). Specifically, plaintiff identified the following communications as misrepresentation: (1) a July 13, 2011 letter from Vermeka Lang to plaintiff that states in the subject line "Insured: Puya Shakiba"; (2) a November 13, 2011 letter from Ms. Lang to plaintiff that states in the subject line "Insured: Puya Shakiba"; (3) a May 23, 2012 letter from Christine Fletcher to plaintiff that states in the subject line "Insured: Puya Shakiba"; (4) an October 26, 2012 letter from Ms. Fletcher to plaintiff that states in the subject line "Insured: Puya Shakiba"; (5) a March 15, 2013 letter from Ms. Fletcher to plaintiff that states in the subject line "Insured: Puya Shakiba"; and (6) a June 26, 2013 letter from Ms. Fletcher to plaintiff that states in the subject line "Insured: Puya Shakiba." (ECF No. 99-1 at 10 (citing ECF Nos. 99-8–99-13)). As further noted by defendant, plaintiff only communicated with defendant through Ms. Lang and Ms. Fletcher, and plaintiff merely "recalls speaking to someone at [defendant] a couple of times, but does not recall who it was or what was discussed." (Id. at 9 (citing ECF No. 99-3 at 5, 10)). Finally, defendant notes, plaintiff "does not recall anyone at [defendant] telling him that Puya Shakiba was the at-fault driver," but rather, that plaintiff "assumed that because Puya Shakiba was identified as the insured that also meant that he was the driver." (Id. at 10 (citing ECF No. 99-3 at 6)).

Once plaintiff retained counsel, defendant states, plaintiff gave his attorney, Mr. Rosen, "one of the letters he received from [defendant] that identifies Mr. Shakiba as the insured." (Id. at 11 (citing ECF No. 99-3 at 8, 9)). Thereafter, Mr. Rosen and defendant exchanged several communications including: (1) a November 26, 2013 letter from Ms. Fletcher to Mr. Rosen with a subject line that states "Insured: Puya Shakiba"; (2) a May 9, 2014 letter from Ms. Fletcher to Mr. Rosen with the subject line referencing "Insured: Puya Shakiba"; (3) a June 2, 2014 letter from

Mr. Rosen to Ms. Fletcher referencing "Your Insured: Puya Shakiba" in the subject line[7]; (4) a June 27, 2014 email from Mr. Rosen to Ms. Fletcher with the subject "Biejan Arvon v. Puya Shakiba"; (5) plaintiff's Complaint naming Puya Shakiba as the defendant; (6) a July 2, 2014 email from Mr. Rosen to Ms. Fletcher in which Mr. Rosen forwarded his June 27, 2014 email with the same subject "RE: Biejan Arvon v. Puya Shakiba"; and (7) Ms. Fletcher's July 2, 2014 response to that email in which she did not alter the subject line. (Id. at 11–12 (citing ECF Nos. 99-15–99-19)).

In sum, the only statements alleged by plaintiff to be misleading are those that refer to Puya Shakiba as an insured individual. Plaintiff acknowledges that there is no evidence in the record that Ms. Fletcher, or anyone individual on behalf of defendant, ever stated that Mr. Shakiba was the at-fault driver. (ECF No. 113 at 7). Further, there is no dispute that Mr. Shakiba was listed as the insured on all communications to plaintiff and Mr. Rosen because he was, in fact, one of the policyholders on the account. (ECF No. 99-1 at 13). Accordingly, because there is no dispute that the phrase "Insured: Puya Shakiba" is an entirely truthful statement, this cannot be considered a false statement of material fact.

Plaintiff argues, however, that plaintiff was, in fact, misled by defendant's letters, and that there is therefore a dispute over the misleading nature of those letters. (ECF No. 113 at 13). Plaintiff also argues that defendant's "own records reflect multiple instances of concealment and deception." (Id.) Specifically, plaintiff argues, defendant "communicated with [plaintiff] and his wife as though Mr. Shakiba were driving" by informing plaintiff's wife that "'liability has been established and coverage is clear.'" (Id. (citing ECF No. 113-7 at 49)). Accordingly, plaintiff argues, defendant "must have known that [plaintiff and his wife] would draw the only possible

---

[7] As noted by plaintiff, this letter also states "[a]s you know, your insured, Puya Shakiba, rear ended [plaintiff]." (ECF No. 113 at 8).

reasonable inference: that [defendant] was admitting the liability of Mr. Shakiba, the only party it had revealed, discussed, or would later discuss with them." (Id. at 13–14). Finally, plaintiff argues that defendant "chose to identify the only policy holder not in the car that day," even though it "was capable of listing more than one name in its letters." (Id. at 14). In sum, plaintiff appears to be arguing that, even if defendant's statements were not purely false, they were misleading due to defendant's failure to disclose a material fact, i.e., the identity of the driver.

A defendant may make a false statement for the purposes of negligent misrepresentation if it "unreasonably failed to make statements at all, or failed to make statements needed to clarify the plaintiff's understanding." Smith v. Integral Consulting Servs., Inc., Civil No. DKC-14-3094, 2016 WL 4492708, at *7 (D. Md. Aug. 26, 2016) (quoting Griesi v. Atl. Gen. Hosp. Corp., 360 Md. 1, 14 (2000)). Further, negligent misrepresentation may apply when misrepresentations are not "purely false as stated," but "became materially misleading by virtue of material facts that [defendants] negligently failed to disclose." Lubore v. RPM Assocs., Inc., 109 Md. App. 312, 340–41 (1996). Similarly, for a claim of fraudulent misrepresentation, a plaintiff may pursue a theory of concealment or non-disclosure by showing that a defendant failed to disclose a material fact. Id. at 329. To succeed on a claim of either negligent or fraudulent misrepresentation, however, plaintiff must also show that defendant owed a duty of care to plaintiff. Id. at 329, 335 (first element of fraudulent misrepresentation by concealment of non-disclosure is that the "[d]efendant owed a duty of plaintiff to disclose a material fact; first element of negligent misrepresentation is that "the defendant, owing a duty of care to the plaintiff, negligently asserts a false statement").

"The existence of a duty of care . . . is highly dependent upon the facts of a given case." Adams v. NVR Homes, Inc., 135 F. Supp. 2d 675, 702 (D. Md. 2001). "A tort duty in general has

been defined as 'an expression of the sum total of those considerations of policy which lead the law to say that plaintiff is entitled to protection.'" <u>Id.</u> (quoting <u>Jacques v. First Nat'l Bank</u>, 307 Md. 527, 533 (1986)). "Although '[t]here is no precise formula for determining the existence of a duty of care between two parties,' a plaintiff who claims economic loss from negligent misrepresentation must show an 'intimate nexus' through 'contractual privity or its equivalent.'" <u>Dierker v. Eagle Nat'l Bank</u>, 888 F. Supp. 2d 645, 655 (D. Md. 2012) (quoting <u>Griesi v. Atl. Gen. Hosp. Corp.</u>, 360 Md. 1, 12 (2000)). Specifically, "the relationship of the parties . . . must be such that in morals and good conscience the one has the right to rely upon the other for information, and the other giving the information owes a duty to give it with care." <u>Id.</u> (quoting <u>Griesi</u>, 360 Md. at 13–14).

Here, plaintiff alleges that defendant took affirmative acts that created a duty of care between defendant and plaintiff. Specifically, plaintiff alleges, defendant uses "Direct Deal" guidelines, which encourage associates to "create an environment of trust and credibility" to convince claimants to resolve claims "without delay and cost associated with involving an attorney." (ECF No. 113 at 1–2 (quoting ECF Nos. 113-3 at 3, 113-4 at 2)). Plaintiff further alleges that, pursuant to this program, defendant "expressly admitted liability . . . encouraged [plaintiff] to engage directly with [defendant] without engaging an attorney . . . and even paid more than ten thousand dollars to [plaintiff] and his medical providers." (<u>Id.</u> at 11 (citations omitted)). As to defendant's payments to plaintiff, plaintiff argues that these payments show that defendant "acted to entice [plaintiff] into a relationship of confidence." (<u>Id.</u>) As a result of defendant's conduct, plaintiff argues, plaintiff "reasonably expected [defendant] to proceed to [a] final settlement in good faith." (<u>Id.</u> at 12 (citation omitted)).

In response, defendant argues that "the Direct Deal guidelines have no relevance to this case" because defendant ceased all communication with plaintiff nearly one year before the expiration of the statute of limitations, once he retained an attorney. (ECF No. 117 at 2). Further, "while [defendant] agrees that it was required to act, and in fact did act in a reasonable manner in its direct dealings with [plaintiff]," defendant argues that "the Direct Deal guidelines did not create any special relationships or duties to the plaintiff to ensure that he understood who and when to sue." (Id.) As to plaintiff's arguments that the intent of the Direct Deal guidelines was to "lull unrepresented persons into a sense of security" and "convince claimants that they did not need a lawyer and could resolve their claims without one, relying on [defendant's] trustworthiness and competency," defendant argues that plaintiff's arguments are unsubstantiated. (Id. at 3 (citing ECF No. 113 at 9)). Rather, defendant argues, "the stated goals of the Direct Deal guidelines are 'to collect information more swiftly and provide[] the injured claimant a prompt disposition of the claim." (Id. (citing ECF No. 113-2 at 8)). Defendant acknowledges that the guidelines are "predicated on prompt initial follow-up contacts as well as creating an environment of trust and credibility," but argues that "it is a leap to suggest that the intent is to lull the claimants into forgoing legal representation for the benefit of [defendant]," especially when the guidelines specifically state that the claimant can obtain or consult with a lawyer at any time. (Id.) Indeed, defendant argues, it "does not save money on claims, or settle them cheaper because the claimants are unrepresented, or conversely pay more because the claimant is represented by counsel." (Id. at 4).

"Courts applying Maryland law have found an intimate nexus between parties who have engaged in detailed, months-long business negotiations, or contemplated a long-term relationship." Dierker, 888 F. Supp. 2d at 655 (footnotes omitted). Other factors considered are

"whether the party making the alleged misrepresentation 'had exclusive control over material information necessary for [the other party] to understand the situation,' and whether the defendant's 'promises were an inducement to the plaintiff and provided the defendant with a business advantage when the plaintiff acted in conformance with them.'" Id. at 655–56 (footnotes omitted). In Dierker, the plaintiff, the owner and sole shareholder of a mortgage brokerage firm, applied to open a branch with the defendant, a federally-chartered bank. Id. at 648. When meeting with representatives from the defendant, the plaintiff asked if the defendant could bank 100% of his firm's loans, and a representative responded "with a 'mocking type of tone that said, as we're a federally chartered bank, we can handle whatever volume you could potentially bring.'" Id. at 649. After that meeting, the plaintiff decided to work with the defendant, and began operating his firm as a branch of the defendant's. Id. Due to the defendant's understaffing, however, loan processing was delayed, and the plaintiff lost revenue. Id. at 649–50. The court found that there was a genuine dispute of material fact regarding whether the defendant had a legal duty of care to the plaintiffs when the parties had "lengthy negotiations, about forming a long-term relationship," where the defendant "had exclusive control over information . . . that [the plaintiff] needed to understand the situation," and the plaintiff made financial decisions and gave money to the defendant "because of [the defendant's] representations." Id. at 656.

Here, however, plaintiff and defendant were not engaged in detailed, months-long negotiations, nor did the parties contemplate a long-term relationship. Id. at 655. Rather, the parties' interactions were relatively limited. First, in July of 2011, Ms. Lang spoke to plaintiff and his wife regarding the accident and the extent of his injuries, and that same month, defendant issued payment for repair of the car that plaintiff was driving. (ECF No. 99-1 at 9). Then, between July of 2011 and June of 2013, defendant sent six letters to plaintiff regarding his claim. (Id. at 10).

On August 30, 2013, Ms. Fletcher spoke to plaintiff's wife, who advised that plaintiff had retained counsel. (Id. at 11). From that point forward, defendant dealt exclusively with Mr. Rosen.[8] (Id. at 11–12). As noted by defendant, plaintiff merely "recalls speaking to someone at [defendant] a couple of times, but does not recall who it was or what was discussed." (Id. at 9 (citing ECF No. 99-3 at 5, 10)).

Similarly, unlike in Dierker, there is no evidence here that defendant had exclusive control over the identity of the at-fault driver. Rather, as noted by both defendant and the Maryland Court of Special Appeals, the at-fault driver, Mr. Gol, was identified in the police report of the accident, which was publicly available for anyone to request. (ECF No. 99-1 at 7); Arvon v. Shakiba, No. 2719, 2017 WL 1592555, at *4 (Md. Ct. Spec. App. May 1, 2017). As noted by defendant, "Ms. Fletcher had a copy of the police report and would have provided a copy to Mr. Arvon or Mr. Rosen had they asked for it." (ECF No. 99-1 at 15 (citing ECF No. 99-20 at 7)). Further, either plaintiff or Mr. Rosen could have obtained a copy of the report from the police, but apparently did not. Arvon, 2017 WL 1592555, at *4.

Finally, unlike in Dierker, here, there is no evidence that defendant's statements were "an inducement to the plaintiff [that] provided the defendant with a business advantage when the plaintiff acted in conformance with them." 888 F. Supp. 2d at 655. Rather, the evidence of record shows that defendant initially contacted plaintiff to see if a settlement could be reached after defendant accepted coverage for the accident and admitted liability. (ECF No. 99-1 at 9). Indeed, defendant issued payment for the repair of the car plaintiff was driving shortly after the accident. (Id.) Similarly, defendant paid plaintiff's outstanding medical bills after plaintiff's wife informed

---

[8] As to defendant's interactions with Mr. Rosen, these appear to be limited to defendant's repeated attempts to reach Mr. Rosen over the course of six months, followed by one phone call in March of 2014 and an exchange of letters and emails between May and July of 2014. (Id. at 11–12).

Ms. Fletcher that the bills were in collection, although the parties ultimately failed to reach an agreement regarding the remaining damages. (Id. at 15). While plaintiff attempts to argue that defendant's Direct Deal program was "designed to lull unrepresented persons into a sense of security" and "convince claimants that they did not need a lawyer and could resolve their claims without one," (ECF No. 113 at 9), as noted by defendant, this argument is "a diversion that has no bearing" on defendant's duty of care. (ECF No. 117 at 1). Rather, there is simply no evidence of record that defendant identified Mr. Shakiba as an insured to prevent plaintiff from recovering damages from defendant. Accordingly, plaintiff has failed to establish that there was an "intimate nexus" that imposed a duty on defendant to identify the at-fault driver. See Lubore v. RPM Assocs., Inc., 109 Md. App. 312, 336 (1996).

In sum, defendant has established that there are no genuine issues of material fact as to the statements made by defendant to plaintiff and Mr. Rosen as to the identity of the at-fault driver or defendant's duty to disclose the identity of the at-fault driver. Here, I find that no reasonable jury could find that defendant owed a duty of care to plaintiff and, in violation of that duty, negligently asserted a false statement regarding the identity of the at-fault driver. Lubore, 109 Md. App. at 335. Accordingly, plaintiff cannot succeed on his claim for negligent misrepresentation (plaintiff's Count II), and defendant's Motion (ECF No. 99) is granted as to this claim. Similarly, no reasonable jury could find that the defendant made a misrepresentation of a material fact which was false or that defendant owed a duty to plaintiff to disclose a material fact and failed to disclose that fact. Finch v. Hughes Aircraft Co., 57 Md. App. 230, 231 (1984) (citing James v. Weisheit, 279 Md. 41, 44 (1977); Fowler v. Benton, 229 Md. 571, 578 (1962)); Lubore, 109 Md. App. at 329 (citing Finch, 57 Md. App. at 231–32, Schnader v. Brooks, 150 Md. 52, 57–58 (1926)).

Accordingly, plaintiff cannot succeed on his claim for fraudulent misrepresentation (plaintiff's Count III), and defendant's Motion (ECF No. 99) is granted as to this claim.

**B.**     **Intent**

Even if plaintiff was able to establish that there are genuine disputes of material fact as to the first element of plaintiff's negligent misrepresentation and fraudulent misrepresentation claims, plaintiff's claims would fail nonetheless because plaintiff has not offered any evidence that there is a genuine dispute of material fact as to the second element of plaintiff's negligent misrepresentation claim or the third element of plaintiff's fraudulent misrepresentation claim.  The second element of a negligent misrepresentation claim is that "the defendant intends that his statement will be acted upon by the plaintiff." Martens Chevrolet, Inc. v. Seney, 292 Md. 328, 337 (1982).  Similarly, the third element of plaintiff's fraudulent misrepresentation claims is that the defendant intended to defraud or deceive plaintiff. Finch v. Hughes Aircraft Co., 57 Md. App. 230, 231–32 (1984) (citing James v. Weisheit, 279 Md. 41, 44 (1977); Fowler v. Benton, 229 Md. 571, 578 (1962) (third element of fraudulent misrepresentation claim is that "defendant made the misrepresentation for the purpose of defrauding plaintiff;"); Lubore v. RPM Assocs., Inc., 109 Md. App. 312, 329 (1996) (citing Finch, 57 Md. App. at 231–32, Schnader v. Brooks, 150 Md. 52, 57–58 (1926)) (third element of fraudulent misrepresentation claim  under theory of concealment or non-disclosure is that "[d]efendant intended to defraud or deceive plaintiff").  Here, plaintiff's claims fail because plaintiff has offered no evidence that defendant intended for plaintiff to act upon its statements or that defendant intended to defraud or deceive plaintiff.

Defendant argues that defendant "did not intend for [plaintiff] or his attorney to believe that Mr. Shakiba was the responsible driver." (ECF No. 99-1 at 30).  Specifically, defendant notes, Ms. Fletcher testified at her deposition that she: (1) did not believe listing Mr. Shakiba on

defendant's letters to plaintiff to be false; (2) did not put Mr. Shakiba in the subject line of the letters to misrepresent the identity of the permissive driver; and (3) did not expect plaintiff or his attorney to rely on her "representation that Puya Shakiba was the insured policyholder." (Id. at 26 (citing ECF No. 99-20 at 6)). Rather, defendant argues, "[a]ccording to Ms. Fletcher, the system used by Liberty Mutual for correspondence automatically populates the subject line and includes the name of one of the named insureds, i.e., policyholders, as the name is pre-loaded." (Id.) Defendant further notes that Ms. Fletcher testified that "changing the insured in the subject line of the letter is not an option" and that "there is no option to list the permissive driver in the subject line of the letter." (Id.) Similarly, in her communication with Mr. Rosen, Ms. Fletcher testified that "she did not believe that Mr. Rosen did not know the identity of the at-fault driver" and that she "would have told Mr. Arvon or Mr. Rosen if she thought that they were under the mistaken understanding [sic] Mr. Shakiba to be the at-fault driver." (Id. at 27).

In response, plaintiff argues that there is a dispute of material fact because, from the outset, defendant knew that Mr. Shakiba was not the at-fault driver but communicated with plaintiff and his wife "as though Mr. Shakiba were driving." (ECF No. 113 at 13 (citing ECF No. 113-7 at 46, 49 55, 58)). Then, plaintiff argues, defendant informed plaintiff's wife that "liability has been established and coverage is clear." (Id. (citing ECF No. 113-7 at 49)). Plaintiff further argues that defendant identified only Mr. Shakiba, "the only policy holder not in the car that day," even though it was capable of listing more than one name in its letters. (Id. at 14 (citing ECF No. 113-19). Accordingly, plaintiff argues, defendant "must have known and intended that [plaintiff and his wife] would draw the only possible reasonable inference: that [defendant] was admitting the liability of Mr. Shakiba, the only party it had revealed, discussed, or would later discuss with them." (Id. at 13–14 (citing ECF No. 113-17) (letter from defendant to plaintiff with subject line

"Insured: Puya Shakiba")). Plaintiff fails, however, to offer even a scintilla of evidence to support his theory that defendant actually did intend for plaintiff to draw this inference or to act in reliance on said inference. Similarly, plaintiff offers no evidence that defendant intended to deceive or defraud plaintiff. Rather, here, plaintiff relies on "mere speculation" and "the building of one inference upon another," which is insufficient to create a genuine issue of material fact. Cox v. Cty. of Prince William, 249 F.3d 295, 299–300 (4th Cir. 2001).

Plaintiff also argues that defendant actually knew that plaintiff was mistaken as to the identity of the driver and purposely failed to correct the misidentification. (ECF No. 113 at 15). Specifically, plaintiff notes that, on June 2, 2014, Mr. Rosen sent defendant a demand letter stating "[a]s you know, your insured, Puya Shakiba, rear ended Mr. Arvon on July 8, 2011." (Id. at 15–16 (citing ECF No. 113-10) (emphasis removed)). Ms. Fletcher responded to said email and stated that she had not "had time to complete the evaluation." (Id. at 6 (citing ECF No. 113-16)). Plaintiff argues, however, that factual disputes exist as to the truth of this statement based on the claims file. (ECF No. 113 at 16). Specifically, plaintiff notes that defendant did not provide plaintiff's demand letter in the claims file initially provided in discovery, but that their subsequent production showed that the letter was received by June 5, 2014, and "organized and reviewed by June 12, 2014." (Id.) Therefore, plaintiff argues that there is "at a minimum, a dispute of fact regarding her representation that she 'ha[d]n't had time.'" (Id.) From these facts, plaintiff appears to suggest that Ms. Fletcher completed her review of the file, knew plaintiff was mistaken as to the driver's identity, and purposely did not correct plaintiff's mistake, presumably with the intent that plaintiff would sue the wrong person and miss the statute of limitations deadline. Ms. Fletcher's statement, however, was that she had not "had time to complete her evaluation," (id. at 6), not that she "ha[d]n't had time." (Id. at 16). Her statement is not inconsistent with the claims file, and,

accordingly, plaintiff has not established a genuine issue of material fact regarding defendant's intent to mislead plaintiff.

In sum, defendant has established that there are no genuine issues of material fact regarding defendant's intent that plaintiff would act in reliance on its statements or defendant's intent to defraud or deceive plaintiff. Accordingly, I conclude that no reasonable jury could find that defendant intended that its statements, or any omissions relating thereto, regarding its insured or the identity of the at-fault driver would be acted upon by the plaintiff. Martens Chevrolet, Inc. v. Seney, 292 Md. 328, 337 (1982). Similarly, I conclude that no reasonable jury could find that defendant intended to defraud or deceive plaintiff. Finch v. Hughes Aircraft Co., 57 Md. App. 230, 231–32 (1984) (citing James v. Weisheit, 279 Md. 41, 44 (1977); Fowler v. Benton, 229 Md. 571, 578 (1962)); Lubore v. RPM Assocs., Inc., 109 Md. App. 312, 329 (1996) (citing Finch, 57 Md. App. at 231–32, Schnader v. Brooks, 150 Md. 52, 57–58 (1926)). Because plaintiff cannot meet the second element of his negligent misrepresentation claim or the third element of his fraudulent misrepresentation claim, both claims necessarily fail.

## IV.   CONCLUSION

For the foregoing reasons, defendant's Motion for Summary Judgment as to Counts II and III of Plaintiff Arvon's Complaint (ECF No. 99) is GRANTED. A separate order will be issued.


September 6, 2019                                      _____/s/_____
                                                      Beth P. Gesner
                                                      Chief United States Magistrate Judge